# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

HARTE R. THOMAS, JR.,      )
                           )

        Plaintiff/Appellee,     )  Shelby Chancery No. 106067-2 R.D.
                           )

VS.                   )  Appeal No. 02A01-9711-CH-00289
                           )

SHAIR LABORATORIES, INC.  )
and DAVID SELF,         )
                           )

        Defendants/Appellants.  )

FILED

November 23, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE
THE HONORABLE FLOYD PEETE, JR., CHANCELLOR

**ALAN BRYANT CHAMBERS**
**CHAMBERS & DURHAM, P.C.**
Memphis, Tennessee
Attorney for Appellants

**JOHN D. HORNE**
Memphis, Tennessee
Attorney for Appellee

**REVERSED AND VACATED**

                                       **ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**HERSCHEL P. FRANKS, J.**

       Shair Laboratories, Inc. and David Self appeal the trial court's judgment awarding

Harte Thomas damages, including treble damages and attorney fees, pursuant to the Tennessee Consumer Protection Act. For the reasons hereinafter stated, we reverse the trial court's judgment.

## I. Factual and Procedural History

The individuals and corporations most relevant to the facts of this case include Shair Laboratories, Inc. (Shair Labs), David Self (Self), Corporate Marketing Group, Inc. (CMG), Rick Kilbourne (Kilbourne), Don McCroam (McCroam), and Harte R. Thomas, Jr. (Thomas). Shair Labs is a closely held Kentucky corporation and is a manufacturer of, among other things, hair care products that are marketed under the trade name "Shair Naturals." Shair Labs operates its business out of Louisville, Kentucky. Self is an officer and 35% shareholder of Shair Labs and resides in Louisville, Kentucky. CMG was a separate Georgia corporation operating out of Duluth, Georgia. CMG contracted with Shair Labs under a master distributorship agreement, which established CMG as being Shair Labs's exclusive distributor for added future distribution of Shair Naturals products from Shair Labs. CMG was neither a division nor a subsidiary of Shair Labs. Neither Shair Labs nor Self controlled or owned any part of CMG and neither received any share of CMG's earnings. Kilbourne was the president of CMG. McCroam was the vice-president of sales for CMG. Thomas is a Tennessee resident who contracted with CMG to become a second-tier distributor and to distribute Shair Naturals products purchased from CMG to hair salons.

At some point prior to any commercial dealings with CMG, Shair Labs intended to market Shair Naturals products by selling to numerous distributors. In furtherance of this goal, it created its own marketing brochure, which outlined various packages from which a distributor could initially choose. These various priced packages were based upon the initial quantity of "units" that the distributor would purchase. Each unit included, among other things, a display to be placed in a hair salon and the hair care products necessary to initially stock the displays. Shair Labs's marketing brochure also included a statement

2

explaining that it must screen its distributor applicants carefully to ensure "that they have the desire, motivation and capital necessary to fulfill the profit potential" that Shair Labs offered. On June 22, 1994, however, Shair Labs and CMG entered into a contract which allowed CMG to market Shair Naturals products by being Shair Labs's exclusive distributor and, thereby, the master distributor of Shair Naturals products. The agreement permitted CMG to use the Shair Naturals trademark in connection with product identification and promotion of Shair Naturals products.

In August 1994, Thomas saw a Memphis newspaper classified advertisement for a distributorship business opportunity dealing with hair care products. The advertisement provided CMG's telephone number and address in Duluth, Georgia, but used the Shair Naturals trade name without listing its own corporate name. The advertisement further stated, "No selling. We secure salon locations; you restock displays and collect for products sold to salon customers." Using the telephone number listed, Thomas contacted and spoke with McCroam, the vice-president of sales for CMG. McCroam sent Thomas some literature, which included the marketing brochure that had been produced by Shair Labs in 1993, and also sent a business card. At the end of the Shair Labs marketing brochure, CMG had added its own "Corporate Marketing Group, Inc." stamp. McCroam's business card displayed the Shair Naturals trademark, in addition to listing CMG's corporate name and displaying the CMG trademark. Also, McCroam's business card had printed "a subsidiary of Shair Laboratories, Inc." next to the Shair Naturals trademark.

After initially speaking with McCroam and reviewing the Shair Labs brochure, Thomas later spoke with Self on at least two occasions before entering into any contract dealing with Shair Naturals products. Though Thomas contends that Self contacted him at some point to screen him in accordance with Shair Labs's procedures (as set forth in Shair Labs's former marketing brochure), Self denies this contention and asserts that either Thomas contacted him or that he simply returned Thomas's calls. Self explains that Thomas was initiating contact and inquiring about the products and the business. Thomas also contacted Shair Labs's accountant, inquiring about whether Shair Labs would be

3

available to supply Shair Naturals products if CMG went out of business. The accountant assured Thomas that if CMG was no longer around at some point and was unable to supply products, then Shair Labs would be able to supply the product. Shair Labs's accountant also mentioned to Thomas, among other things, that Shair Labs and CMG were two entirely separate corporations, even though CMG had the authority to market the products manufactured by Shair Labs. Thomas also contacted another Shair Naturals distributor, whose name was provided by CMG, inquiring about the Shair Naturals distributorship business. Among other things, this person explained that CMG was a separate corporation from Shair Labs and that CMG was merely a primary distributor that set up other new distributors.

In September 1994, McCroam and Kilbourne sent Thomas a proposed distributorship agreement. The contract provided, in part, the following:

> CMG agrees to sell to [Thomas] a Distributorship for SHAIR Products for the amount of $21,689.00 . . . . CMG agrees upon receiving these monies . . . to establish 30 account locations for Distributor on a consignment basis. CMG agrees to place the merchandise . . . in each location. Distributor agrees to service and maintain each location on a weekly basis.

The purchase price of $21,689.00 was essentially equivalent to the cost for 30 displays plus a forty percent mark-up on the price of merchandise to be purchased by CMG from Shair Labs. After reviewing the proposed contract, Thomas initially decided not to enter into it and notified McCroam, who was handling the negotiations, of his refusal. However, CMG offered and agreed to add a repurchase agreement to the proposed contract, which provided Thomas with an option to sell back the distributorship, including all displays and merchandise that were purchased. This repurchase addendum was sent to Thomas and the distributorship agreement between CMG and Thomas was signed by Thomas on November 7, 1994.

All Shair Naturals products that CMG provided to Thomas were ordered by CMG from Shair Labs, were sold to CMG by Shair Labs, and were shipped directly from Shair Labs to Thomas. The original shipment of goods ordered by CMG included the 30 displays and related merchandise to accommodate the "30 account locations" that CMG was

4

obligated to establish under the CMG/Thomas agreement. Though Thomas paid CMG $21,689.00 for the initial 30 displays and for the merchandise to stock the displays, CMG's cost was between $11,000 and $12,000 for the purchase of the merchandise, plus an additional $5,340 for the displays (totaling approximately $17,000).

In January 1995, CMG arranged to have Shair Labs send someone to assist Thomas for a couple days. Because CMG had thus far failed to establish 30 account locations for Thomas, Thomas contacted and dealt with Kilbourne regarding the 30 account locations provision. Kilbourne thereafter arranged for two more persons (one from Alabama and one from Texas) to work with Thomas on establishing account locations. Ultimately, 23 account locations were established.

At some point, business relations between Shair Labs and CMG ended because, among other reasons, CMG defaulted on payment for the products it purchased. On March 3, 1995, Shair Labs sent CMG a letter notifying them of the contract termination. On March 31, 1995, Thomas contacted Self because he had been unable to reach either Kilbourne or McCroam. At this point, Self notified Thomas that Shair Labs's business relations with CMG had ended. Thomas informed Self of the repurchase provision, inquiring as to whether Shair Labs would honor the terms of the CMG/Thomas agreement. Though Self did not believe that Shair Labs was contractually obligated to honor the CMG/Thomas agreement and its repurchase addendum, Shair Labs did begin to sell directly to Thomas and to supply Thomas with Shair Naturals products. On April 26, 1995, Thomas contacted Self about the 30 account locations provision. At this point, Self informed Thomas that he would let Thomas know about sending someone to help. Thereafter, Self informed Thomas that, as between Shair Labs and Thomas, some of the CMG/Thomas agreement terms would need to be changed to form a new contract between Shair Labs and Thomas and that Self would prepare another contract. Subsequently, Thomas made a formal demand against Shair Labs in an attempt to exercise the repurchase provision of the CMG/Thomas agreement.

5

On July 20, 1995, Thomas filed suit against CMG, Kilbourne, Shair Labs., and Self. In Thomas's Complaint, he alleged that *all* Defendants "engaged in unfair and deceptive acts for purposes of inducing [Thomas] to 'invest' in their 'business opportunity,'" and therefore sought actual damages, treble damages, and attorney fees under the Tennessee Consumer Protection Act. Alternatively, Thomas alleged that all Defendants committed fraud or intentional and/or negligent misrepresentation and that all Defendants were liable for breach of contract under the terms of the CMG/Thomas agreement. Shair Labs and Self filed a motion seeking dismissal based upon lack of personal jurisdiction, which was denied by the trial court. Additionally, Thomas was unable to serve process upon either CMG or Kilbourne. Therefore, CMG and Kilbourne were non-suited and the case was tried without a jury against only Shair Labs and Self.

At trial, Thomas's counsel asserted that Kilbourne and McCroam were agents acting on behalf of and for the benefit of Shair Labs. This assertion was based primarily upon Kilbourne's and McCroam's *own* independent actions, including the following:

- The newspaper advertisement placed by CMG did not name CMG but, instead, used the Shair Naturals trade name (even though Shair Labs did not place the newspaper advertisement and had no knowledge of its existence);

- McCroam's business card that was sent to Thomas included a Shair Naturals trademark and referred to Shair Naturals as a subsidiary of Shair Labs (even though, while CMG was authorized to utilize the Shair Naturals trademark in connection with the promotion of Shair Naturals products, the Shair Naturals trademark (designed to identify a product) does not include these additional words, even though Shair Labs never authorized CMG to represent itself in any fashion as a subsidiary of Shair Labs, and even though Shair Labs was not aware of CMG's misuse of the Shair Naturals trademark);

- McCroam sent Thomas the Shair Labs marketing brochure (even though Self had provided the marketing brochure to CMG for them to simply use as a sample and format for their own brochure and even though Shair Labs did not authorize CMG to use the Shair Labs brochure in its own promotion);

- CMG included a Shair Naturals trademark, which referred to Shair Naturals as a subsidiary of Shair Labs, in a bottom corner of the CMG/Thomas agreement (even though CMG's own corporate name and trademark is prominently displayed at the top of the agreement);

- The CMG/Thomas agreement refers to CMG as "the Exclusive Marketing Division" for Shair Labs (even though the agreement expressly states that it was "by and between *Corporate Marketing Group, Inc.* . . . and Harte R. Thomas, Jr." and even though Shair Labs never authorized CMG to refer to itself as a marketing division for Shair Labs);

- An addendum to the CMG/Thomas agreement that details Thomas's exclusive

6

distribution rights within Shelby County, Tennessee mentions, "Shair Laboratories will at the request of [Thomas] set up the new accounts for each unit display" (even though the addendum was expressly signed by Kilbourne only in his capacity as president of CMG and even though Shair Labs never even viewed the CMG/Thomas agreement before CMG's business relations with Shair Labs were terminated);

- Kilbourne's signature on the repurchase addendum indicates him to be the president of "Corporate Marketing Group - *Shair*" (even though Kilbourne's signature on the agreement itself indicates that he was signing only on behalf of "Corporate Marketing Group, Inc." and even though the text of the repurchase addendum provides that "Corporate Marketing Group" agrees to the repurchase option);

- Thomas's cashier's check for $21,689 was payable to "Corporate Marketing Group Inc.--*Shair*" (even though CMG instructed Thomas to identify the payee that way and the check was endorsed and deposited solely by "Corporate Marketing Group, Inc.); and

- When Thomas spoke with Kilbourne about fulfillment of the 30 account locations agreement (*after* the CMG/Thomas agreement had already been executed), Kilbourne would say, "let me talk to [Self] and I will call you back tomorrow," which Thomas claims led him to believe that Kilbourne was representing Shair Labs.

Lastly, in addition to CMG's own independent actions, Thomas asserted that his conversation(s) with Self prior to entering into the CMG/Thomas agreement accorded with Shair Labs's own marketing brochure, whereby Shair Labs stated that it must screen *its* applicants. When asked about what deceptive acts Thomas claims Self committed, Thomas testified, "Well, they just never lived up to the agreement. They were supposed to set up 30 locations . . . . And then he reneged on the repurchase agreement, which I wanted to execute."

Thereafter, the trial court awarded Thomas a judgment against both Shair Labs and Self for violation of the Tennessee Consumer Protection Act and awarded damages totaling $75,366.38, which consisted of asserted actual damages of $20,097.70, trebled to the amount of $60,293.10, plus attorney fees of $15,073.28 (based upon a contractual 25% contingency fee agreement between Thomas and his counsel).

Shair Labs and Self have presented the following issues for appeal:

1. Whether the trial court had *in personam* jurisdiction over Shair Labs and Self;

2. Whether the trial court erred in finding that Shair Labs and Self violated the Tennessee Consumer Protection Act;

3. Whether the trial court erred by imposing treble damages under the Tennessee Consumer Protection Act;

4.  Whether the trial court erred in finding there was a contract between Shair Labs and Self on one part, and Thomas on the other part;

5.  Whether the trial court erred in finding that Shair Labs and Self breached the contract;

6.  Whether the contract is unconscionable;

7.  Whether the trial court erred in its award of damages by failing to account for Thomas's part in creating financial losses to himself; and

8.  Whether the trial court erred in its award of damages by failing to account for products and displays retained by Thomas.


## II.  Personal Jurisdiction


As mentioned earlier, Shair Labs and Self moved for dismissal based upon lack of personal jurisdiction, which was denied by the trial court.  Personal jurisdiction refers to the court's authority to adjudicate a claim as to a person.  Landers v. Jones, 872 S.W.2d 674, 675 (Tenn. 1994).  Tennessee's long-arm statute relating to persons unavailable to personal service in Tennessee provides:

> (a) Persons who are nonresidents of Tennessee . . . and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:
> (1) The transaction of any business within the state;
> (2) Any tortious act or omission within this state;
> . . .
> (5) Entering into a contract . . . for materials to be furnished in this state;
> (6) Any basis not inconsistent with the constitution of this state or of the United States;
> . . . .
> (b) "Person," as used herein, includes corporations and all other entities which would be subject to service of process if present in this state.
> . . . .

Tenn. Code Ann. § 20-2-214 (1994).  In Masada Investment Corp. v. Allen, the Tennessee Supreme Court noted that subsection (6) expands the personal jurisdiction of Tennessee courts to the full limit allowed by due process, whereby sufficient minimum contacts may support jurisdiction.  697 S.W.2d 332, 334 (Tenn. 1985).  The Court further set forth three primary factors that are to be considered in determining whether sufficient minimum contacts exist, "the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts."  Id.  In Masada, the Court found that sufficient minimum contacts may exist even when a defendant never entered

Tennessee and even though the defendant had no *direct* financial interest in a particular transaction underlying the suit. Id. at 335. "[T]he absence of physical contacts will not defeat *in personam* jurisdiction where a commercial actor purposefully directs his activities toward citizens of the forum State and litigation results from injuries arising out of or *relating* to those activities." Id. at 334 (emphasis added) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)). In such cases, due process requires that nonresident defendants be subjected to personal jurisdiction if, and only if, the nonresident had such minimum contacts with this state that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." International Shoe Co. V. Washington, 326 U.S. 310, 316 (1945).

Even though Self never entered Tennessee and even though Shair Labs had no *direct* financial interest in the original sale of Thomas's distributorship, they wilfully and knowingly shipped all Shair Naturals products directly to Thomas in Tennessee with knowledge of the existence of Thomas's second-tier distributorship and with knowledge of their own indirect financial interest. Further, Self had direct dealings with Thomas before execution of the CMG/Thomas agreement and, knowing Shair Labs's indirect financial interest in Thomas's distributorship, relayed information and representations about the Shair Naturals business. Therefore, we find that the evidence in this case does not preponderate against the trial court's finding of sufficient minimum contacts to support personal jurisdiction.

### III. Thomas's claims against Shair Labs and Self

The Tennessee Consumer Protection Act of 1977 (the Act) was enacted by Tennessee's legislature "to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn. Code Ann. § 47-18-102(2) (1995). Under the Act, a consumer is defined so as to include "any person who purchases or to whom is offered for sale a franchise or distributorship agreement or any similar type of

9

business opportunity." Id. § 47-18-103(2). Under the Act:

> the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:
>
> . . .
>
> (12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;
>
> . . .
>
> (14) Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction;
>
> . . .
>
> (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person;
>
> . . . .

Tenn. Code Ann. § 47-18-104(b) (Supp. 1998).

Our review of the trial court's consumer protection factual finding is *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. See Tenn. R. App. P. 13(d). Upon review, we find that the preponderance of the evidence in this case weighs against the trial court's finding of a consumer protection violation by Shair Labs and Self. First, even though CMG may have unilaterally represented that the CMG/Thomas agreement conferred rights or obligations as against Shair Labs by representing that CMG was acting on behalf of or for the benefit of Shair Labs, neither Shair Labs nor Self made any such representation. Second, even though CMG may have caused confusion or misunderstanding by creating an impression that CMG was acting as Shair Labs's agent, neither Shair Labs nor Self caused or created such confusion or misunderstanding. Third, we find no other act of practice engaged in or committed by Shair Labs or Self that was deceptive to Thomas.

In addition to other facts explained earlier, the following facts weigh against the trial court's finding of a consumer protection violation. First, Shair Labs did not place the newspaper advertisement. In fact, Self had no knowledge whatsoever of any newspaper advertisements except for the one placed in the Memphis newspaper, which was unknown to him until this pendency of this lawsuit. Second, Self did not, at any point, tell Thomas that either he or Shair Labs owned any part of CMG. Third, Shair Labs never authorized CMG to represent itself as a subsidiary of Shair Labs. Fourth, neither Self nor anyone else

at Shair Labs ever informed Thomas that either Self or Shair Labs was obligated to help Thomas get set up in business. Fifth, Thomas knew that CMG was a separate corporation from Shair Labs. Sixth, Thomas was aware that *CMG* was having its officers sign the CMG/Thomas agreement, and was aware that Shair Labs did *not* have any of its officers sign the CMG/Thomas agreement. Lastly, Thomas never asked Self whether Kilbourne had the authority to sign anything for Shair Labs and Shair Labs never represented any such authority. Because we have determined that the preponderance of the evidence weighs against the trial court's finding, we reverse and vacate the trial court's judgment against Shair Labs and Self and its award of damages, including treble damages, plus attorney fees.

Shair Labs's and Self's fourth, fifth, and sixth issues, as stated above, relate to the existence of an enforceable contract between Shair Labs and Thomas. Though Thomas asserts that an apparent agency renders the CMG/Thomas agreement to be enforceable as against Shair Labs, the evidence preponderates against any such finding. In Durham v. Waddell & Reed, Inc., 723 S.W.2d 129 (Tenn. Ct. App. 1986), this Court recognized, "In determining questions of apparent agency, the apparent power of the agent is determined by acts of the principal, not by acts of the agent." 723 S.W.2d at 130 (citing Kelly v. Cliff Pettit Motors, 191 Tenn. 390, 234 S.W.2d 822, 824 (1950)). In Durham, this Court went on to recognize:

> The principal must have affirmatively held the agent out as possessing sufficient authority to embrace the particular act in question or else voluntarily, and in due awareness, actual or contructive, of the agent's assumption of power permitted him to act as if he had the requisite authority.

723 S.W.2d at 130 (quoting 2A C.J.S., *Agency* § 161 at 798 (1972)). In the instant case, the evidence preponderates against any finding that Shair Labs held either CMG or CMG's officers out as possessing sufficient authority to bind Shair Labs to the unique terms of the CMG/Thomas agreement. Moreover, Shair Labs did not voluntarily permit either CMG or CMG's officers to act as if they had such authority. Because the evidence preponderates against a finding that the terms of the CMG/Thomas agreement were enforceable as against Shair Labs, further analysis and consideration of the fourth, fifth, and sixth issues is unnecessary. Lastly, in light of our reversal of the trial court with respect to liability, we

11

find it unnecessary to address the seventh and eighth issues on appeal, which pertain to the trial court's award of damages.

### III. Conclusion

Accordingly, the trial court's judgment is hereby reversed and vacated. Costs of this appeal are taxed to Thomas, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:


_____
CRAWFORD, P.J., W.S.


_____
FRANKS, J.